This case presents a question not previously addressed by this Court, involving Article 4 of our enactment of the Uniform Commercial Code, entitled "Bank Deposits and Collections." The plaintiff, Southern Guaranty Insurance Company (hereinafter "Southern"), appeals from a partial summary judgment in favor of the defendant, First Alabama Bank (hereinafter "FAB").
Southern issued an insurance policy to Bay Paper Company (hereinafter "Bay Paper") insuring it against, among other things, loss from employee dishonesty. Southern brought this action as subrogee of the insured, Bay Paper.
In March 1984, Bay Paper's president, Alan Hirsch, hired Sue Russell as Bay Paper's bookkeeper. Bay Paper did not, as part of the hiring process, perform an extensive background check on Ms. Russell, nor was she a bonded employee. Ms. Russell worked on Bay Paper's payroll account, kept the general ledger, and maintained Bay Paper's payables checkbook. She was solely responsible for Bay Paper's payroll and checking procedures, and she was solely responsible for reviewing the company's bank statements and cancelled checks. Further, she was the only Bay Paper employee responsible for reconciling the company's bank statements with the checking and payroll records.
Bay Paper maintained a payroll checking account at FAB. On April 12, 1985, Ms. Russell opened a personal checking account at FAB. Her signature card indicated that she was employed as Bay Paper's bookkeeper. Beginning in October 1985, Ms. Russell embarked upon a scheme of writing duplicate payroll checks drawn on Bay Paper's payroll account at FAB and made payable to existing Bay Paper employees. Ms. Russell forged the signature of Alan Hirsch, president of Bay Paper, and then forged the indorsements of the payees. She then deposited the checks into her personal checking account.
The first item bearing a forged drawer's signature and a forged indorsement was deposited by Sue Russell on October 20, 1985; FAB included that item in the bank statement made available to Bay Paper on October 31, 1985. Within 14 days following the October 31, 1985, bank statement, Russell deposited one other item bearing a forged drawer's signature and a forged indorsement. The two items totaled $1,430.16. Ms. Russell continued forging Mr. Hirsch's signature and employee indorsements on Bay Paper's payroll checks from October 1985 through April 1986. In all, she deposited $19,045.97 of Bay Paper funds into her personal account at FAB. Neither party disputes that FAB credited Sue Russell's account with the amounts represented by these forged checks, nor that FAB deducted these amounts from Bay Paper's account.
FAB guidelines require tellers to ensure that the indorsement on a check accepted for deposit is the indorsement of the person into whose account the check is being deposited. Neither party disputes that only one of the 25 checks that FAB's tellers accepted for deposit into Ms. Russell's account bore her indorsement. Moreover, 11 of the forged checks that FAB accepted for deposit into Sue Russell's account, including the first two forged checks she deposited, bore restrictive indorsements restricting the checks to deposit for credit of the named payee; nevertheless, FAB accepted these checks for deposit into Ms. Russell's account. *Page 734 
Southern sued FAB in December 1986, alleging two causes of action. First, Southern claimed that FAB was negligent in failing to follow established banking practices, failing to act in a commercially reasonable manner, failing to detect the forged signatures on Bay Paper's checks, and failing to detect forged indorsements, and that its negligence had proximately caused Southern to sustain damages. Second, Southern alleged that FAB had failed to follow established banking procedures, had paid items that were not properly payable, and had failed to act in accordance with commercially reasonable standards applicable to the banking business, and was therefore liable in conversion for the total amount of Southern's loss, $19,045.97.
FAB moved for summary judgment, and the trial judge granted that motion with respect to all of Southern's claims except for the sum of $1,430.16, representing the first two checks, which he awarded Southern. Southern appealed.
Whether FAB's summary judgment was proper turns upon whether a drawee bank is liable to a customer, despite that customer's negligence, when the drawee fails to exercise ordinary care in making payment on forged checks.
In reviewing a summary judgment, we employ the same standard as that of the trial court in determining whether the evidence before the court made out a genuine issue of material fact.Chiniche v. Smith, 374 So.2d 872 (Ala. 1979). Garrigan v.Hinton Beef Provision Co., 425 So.2d 1091 (Ala. 1983). Where there is no genuine issue of material fact and the moving party is entitled to a judgment on the matter, summary judgment is proper; but where evidence is produced that supports the position of the non-moving party, summary judgment can not be granted. Rule 56(c), Ala.R.Civ.P.; Cole v. First Nat. Bank ofTuskaloosa, 485 So.2d 717, 719 (Ala. 1986).
Under Alabama's commercial code, a bank may charge a customer's account only when an item is deemed "properly payable." Ala. Code 1975, § 7-4-401. Thus, by negative implication, § 7-4-401 imposes liability on a drawee bank that charges a customer's account for items not properly payable. White Summers, Handbook of the Law Under the UniformCommercial Code, § 15-3 (2d ed. 1980). The crux of the plaintiff's claim is that FAB improperly paid those items forged by Ms. Russell, and, therefore, that Southern is entitled to recover from FAB the funds it reimbursed Bay Paper.
Alabama's commercial code, however, imposes certain duties not only upon the bank, but upon the bank customer as well. Section 7-4-406(1) provides:
 "When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof."
The record reflects, without contradiction, that Bay Paper's bookkeeper, Ms. Russell, worked on Bay Paper's payroll account, kept the general ledger, and maintained Bay Paper's payables checkbook. She was solely responsible for Bay Paper's payroll and checking procedures, and she was solely responsible for reviewing the company's bank statements and cancelled checks. Moreover, she was the only Bay Paper employee responsible for reconciling the company's bank statements with the checking and payroll records. This evidence is sufficient to warrant the conclusion that Bay Paper failed to exercise reasonable care as required under § 7-4-406(1). See Industrial Systems ofHuntsville, Inc. v. American Nat. Bank of Huntsville,376 So.2d 742 (Ala.Civ.App. 1979).
A customer's failure to comply with § 7-4-406(1) is dealt with by § 7-4-406(2):
 "If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer *Page 735 
by subsection (1) the customer is precluded from asserting against the bank:
 "(a) His unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and
 "(b) An unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration."
FAB asserted in its motion for summary judgment that §7-4-406(2) precluded its liability under § 7-4-401. The trial court agreed, awarding Southern only $1,430.16, which represents that portion of the claim that accrued during the 14-day period following the date upon which the first item bearing an unauthorized signature and a statement reflecting that item were made available to Bay Paper.
A third subsection, however, also bears upon the issue in this case. Section 7-4-406(3) states that "[t]he preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s)." Our Court of Civil Appeals has held that under this section the bank is not required to establish that it exercised ordinary care, but that the plaintiff has the burden of establishing the bank's lack of ordinary care. IndustrialSystems, at 745. We agree. Thus, we now look to determine whether the plaintiff adduced any evidence that would permit a finding that the bank failed to exercise ordinary care when it deposited forged checks into Ms. Russell's account.
FAB's failure to require Ms. Russell to indorse the checks she presented for deposit, and FAB's acceptance of checks for deposit into Ms. Russell's account despite the presence of restrictive indorsements constitutes some evidence from which the jury could find that FAB failed to exercise ordinary care in paying forged Bay Paper checks.
FAB argues, however, that checks involving "double forgeries," that is, cases where both the drawer's signature and the indorsement are forged, are regarded as forged checks only, and that, therefore, any negligence of the drawee bank with regard to indorsements is irrelevant. See, Perini Corp. v.First Nat'l Bank, 553 F.2d 398 (5th Cir. 1977).
We do not believe the "double forgery" issue as addressed inPerini is implicated under the present facts, and, therefore, we neither adopt nor reject the view represented by that case. The Perini court dealt with the question of where to allocate loss as between a drawee bank and a depository bank; the question before this Court addresses where to allocate loss as between the drawee bank and the customer. We further note that, under the present facts, FAB acted as both the drawee bank and the depository bank; thus, there can be no question as to where the loss will be allocated as between the drawee bank and the depository bank.
It is true that other courts have held that, where a "double forgery" exists, the customer's cause of action against the drawee bank is based upon the forged drawer's signature, and not upon the forged indorsement. Id. However, the fact that the customer does not have a cause of action based upon the forged indorsement when there is a "double forgery" does not mean that the drawee bank's failure to exercise ordinary care with regard to indorsements is irrelevant for purposes of imposing liability on the drawee bank based upon its payment of a check with a forged drawer's signature. Section 7-4-406(3) requires the bank to exercise ordinary care in paying items. The language of § 7-4-406(3) is unqualified. The statute does not distinguish between items bearing forged drawer's signatures and items bearing forged indorsements, but requires the exercise of ordinary care as to all items. Therefore, one can not, as FAB suggests, selectively exercise ordinary care with regard to the drawer's signature *Page 736 
and remain true to the clear mandate of the statute; rather, the statute requires the exercise of ordinary care with regard to the item as a whole. To rule otherwise, we believe, would narrow the scope of the provision beyond what we think the drafters intended.
We are impressed with the reasoning of the Supreme Court of North Dakota in a case involving the exact issue before us. There, the plaintiff customer brought suit against the drawee bank for payment of checks drawn on the customer's account which bore forged drawer's signatures. The drawee bank asserted that the customer was precluded from recovering on these checks under § 4-406(2) of the UCC. The customer contended that the preclusion of § 4-406(2) did not apply because the drawee bank, in paying the checks, had failed to exercise "ordinary care" within the meaning of § 4-406(3) because the indorsements on the checks were defective. The issue before the court was whether the drawee bank, in making payment on the forged checks, had failed to exercise ordinary care within the meaning of § 4-406(3) of the UCC. The Supreme Court of North Dakota stated:
 "Each of the nine forged checks at issue on this appeal has Wayne Anderson's signature forged as drawer of the check by Averill Anderson. All nine checks are payable to the order of Wayne Anderson as payee; however, none of the checks is endorsed with Wayne Anderson's signature, either genuine or forged. In our determination of whether or not the trial court erred in finding that Citizens failed to exercise ordinary care in making payment on the forged checks we must scrutinize Citizens' payment of each check with respect to:
(1) the drawer's signature on the check, and
(2) the endorsement(s) on the check."
Thoreson v. Citizens State Bank, 294 N.W.2d 397, 400 (N.D. 1980).
We hold, therefore, that the drawee bank's negligence with regard to the indorsements on checks is relevant for purposes of § 7-4-406(3).[1]
Because material evidence exists supporting the position of the non-moving party, we must reverse FAB's summary judgment.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, JONES, ALMON, ADAMS, STEAGALL and KENNEDY, JJ., concur.
[1] We offer a caveat regarding this general holding: a factual similarity between the case presently before the Court and the case of J. Gordon Neely Enterprises, Inc. v. American Nat'lBank of Huntsville, 403 So.2d 887 (Ala. 1981), exists. However, the parties in J. Gordon Neely asserted § 7-3-406, "Negligence contributing to alteration or unauthorized signature," not §7-4-406, "Customer's duty to discover and report unauthorized signature or alteration." Section 7-3-406 provides in pertinent part:
 "Any person who by his negligence substantially contributes to . . . the making of an unauthorized signature is precluded from asserting . . . lack of authority against . . . a drawee . . . who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."
Because this case, in its present posture, does not present the question of whether Bay Paper's supervision of Sue Russell substantially contributed to the forged checks, or whether FAB paid Bay Paper's checks in accordance with reasonable commercial standards, we do not here address those issues.